## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHRISTINA CONYERS WILLIAMS** | ) |
| 2 Watch Hill Place | ) |
| Gaithersburg, MD      20878 | ) |
| | ) |
| Plaintiff, | ) |
| | ) C. A. NO. |
| **ROBERT JOHNSON,** Individually, and as | ) |
| Senior Deputy Director | ) |
| Addiction Prevention and Recovery Administration | ) |
| DISTRICT OF COLUMBIA DEPARTMENT OF HEALTH | ) JURY TRIAL DEMANDED |
| 1300 First Street, N.E., Third Floor | ) |
| Washington, D.C. 20002 | ) |
| | ) |
| **DAVID ANTHONY,** Individually, and as Chief of Staff to the | ) |
| Senior Deputy Director | ) |
| Addiction Prevention and Recovery Administration | ) |
| DISTRICT OF COLUMBIA DEPARTMENT OF HEALTH | ) |
| 1300 First Street, N.E., Third Floor | ) |
| Washington, D.C.  20002 | ) |
| | ) |
| and | ) |
| | ) |
| **THE DISTRICT OF COLUMBIA** | ) |
| 444 Fourth Street, N.W. | ) |
| Washington, D.C. 20001 | ) |
| | ) |
| **Defendants.** | ) |

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF
ARISING FROM VIOLATIONS OF THE FIRST AMENDMENT OF THE
UNITED STATES CONSTITUTION AND THE DISTRICT OF COLUMBIA
WHISTLEBLOWER ACT**

### I.  INTRODUCTION

1.      This is an individual action seeking declaratory and injunctive relief, AND

compensatory and punitive damages for violations of the plaintiff's rights under the First

Amendment of the Constitution of the United States of America and the District of Columbia. Government Comprehensive Merit Personnel Act of 1978, as amended by the Whistleblower Reinforcement Act of 1998 §§1-615.51 *et seq.* (2001 ed.) (the "Whistleblower Act").

2.  Plaintiff Christina Conyers Williams contends that defendants have systematically and continuously violated her constitutional, statutory and common law rights by retaliating against her for the exercise of her First Amendment rights and her rights under the Whistleblower Act.

## II.   JURISDICTION AND VENUE

3.    Plaintiff is authorized to invoke the jurisdiction of this Court at this time because the Court has federal question jurisdiction over plaintiff's claims arising under the First Amendment of the United States Constitution.  This Court has pendent and supplemental jurisdiction over plaintiff's claims arising under the D. C. Whistleblower Act.

4.    Venue is properly in the District of Columbia under 28 U.S.C. §1391 because the actions alleged in this complaint occurred in the District of Columbia where Williams is employed by the District of Columbia Department of Health.

## BACKGROUND FACTS

5.    Ms. Williams is presently employed as Chief of the Center of Research, Evaluation and Grants ("CREG") for the Addiction Prevention and Recovery Administration ("APRA") in the District of Columbia Department of Health ("DOH"), where she has worked since June 2004.

6.    Ms. Williams's current job classification is Supervisory (Chief) Research Analyst, MSS 301-15, within the DOH.

7.    Ms. Williams's immediate supervisor is defendant Robert Johnson, who holds

the title of Senior Deputy Director of APRA ("Mr. Johnson").

8.     Mr. Johnson's assistant is defendant David Anthony, who holds the Title of Chief of Staff.

9.     Ms. Williams is a graduate of Wayne State University in Detroit, Michigan with a Bachelor of Arts degree in Sociology.  Ms. Williams holds a Master of Science degree in Health Science Administration from Central Michigan University and a second post-graduate degree, a Master of Public Health from Emory University.

10.     Ms. Williams is 42 years old and has worked in the fields of public health and social work for her entire career.

11.     Prior to beginning employment with the District of Columbia (" the District") on June 28, 2004, Ms. Williams was Executive Director for the National Tuberculosis Controllers Association, Inc. Ms. Williams was a Public Health Advisor for the National Center for Infectious Diseases/Division of Mycotic Diseases at the Center for Diseases Control and Prevention.

12.     Ms. Williams served in the United States Navy for three years and another three years in the Public Health Services Corps from which she was honorably discharged as a Lieutenant.

13.     The official evaluation of Ms. Williams's performance in her  current job, signed by Mr. Johnson and dated November 15, 2005, rated Ms. Williams as "Exceeds Expectations," with a "significantly exceeds expectations" rank for professionalism, resource usage and managing people. Ms. Williams  was ranked "exceeds expectations" for "integrity and trust" and for "teamwork."  *See* Evaluation attached as Exhibit A.

14.     Ms. Williams was hired in 2004 at a salary of $88,000.  Ms. Williams's salary has since increased to $99,000, and most of that increase was because of merit increases.

15.     Ms. Williams's formal job description in APRA requires Ms. Williams to direct the day-to-day activities of the staff in research analysis, contract administration, information systems development, data management and grants administration.  Ms. Williams's job description also requires her to provide her findings to senior executive personnel in the District government, to plan and prepare technical reports, and from time to time to represent APRA in contacts with federal officials, District of Columbia agencies and private and civic groups and organizations. Ms. Williams's job description does **not** include a requirement that she would report to the District Council or testify before the Council.

16.     CREG did not exist as a distinct entity before Ms. Williams was hired. Ms. Williams's staff was made up of employees no longer wanted by other divisions in the DOH.  Ms. Williams had to find work for employees whose skills and interests were unrelated to those required by CREG. There was no money in the budget to fund CREG when Ms. Williams was hired.  Ms. Williams was told if she wanted a budget, she would have to generate grants to provide the funds.

17.     In April 2005, Ms. Williams was given the task of implementing APRA's Client Information System ("ACIS") as that computer software system affected CREG.  Ms. Williams was assigned to conduct training on the new system for staff and contractors.  Getting ACIS on line became the principal responsibility of Ms. Williams's job.

18.     ACIS software was purchased especially for APRA from Softscape, Inc. of Wayland, Massachusetts ("Softscape") to capture statistical data regarding APRA's clients, providers and local contractors to make APRA's operations more efficient.

19.     Ms. Williams was not a District employee when the ACIS contract was let. Originally, ACIS was the responsibility of Pamela Shaw, who as chief of Client Services, previously

supervised information technology ("IT") functions.

20.     When Mr. Johnson assigned Ms. Williams the task of implementing ACIS he said it was because Ms. Shaw had too much other work and because Ms. Shaw was behind schedule in implementing the software program. ACIS had been scheduled to go on line in February or March 2005, but little work had been done to accomplish that goal.

21.     Upon taking over the duties related to ACIS, Ms. Williams's staff increased from six to 10 and included three outside contract employees and Troy Sampson, an IT specialist.

22.     When ACIS was first assigned to Ms. Williams, she asked Ms. Shaw for a copy of the contract and for other information related to the contract.  Ms. Shaw said she did not have a copy of the contract to give to Ms. Williams. The only information Ms. Shaw provided Ms. Williams about ACIS was the dates of future scheduled meetings between APRA and Softscape.

23.     Despite her efforts to obtain a copy, Ms. Williams has never seen the ACIS contract. As a result, Ms. Williams has not received a precise explanation of what tasks Softscape is required to perform under the terms of the contract and how much Softscape is entitled to be paid for services it performs.   Mr. Johnson denied Ms. Williams access to the contract specifications and the measures of performance.

24.     Ms. Williams asked Mr. Johnson for the ACIS contract on at least six separate occasions.  Initially, Mr. Johnson just brushed off Ms. Williams' requests for the contract.  Mr. Johnson became angry when Ms. Williams continued to ask for the contract.  He told her on several occasions that he was tired of her asking for a copy of the contract and he accused her of not being a "team player."

25.     The first project in ACIS, known as Phase 1.0 was to provide on line information

about the experiences of clients at the detoxification unit at DC General Hospital. ACIS was to provide managers with information such as who the clients were, when they were admitted, how long they waited to be served and what services they received.  Many of the employees at the detoxification unit had never used a computer, so they had to be trained in basic computer literacy.

26.     Phase 1.0 of ACIS went on line in June 2005, but did not work very well.  Ms. Williams needed help from Softscape to solve the technical difficulties presented.  Softscape did not respond to Ms. Williams's requests for technical help until the middle of July 2005.

27.     In July 2005, Ms. Williams met with two representatives from Softscape. They refused to do any work until they received $175,000. Ms. Williams provided them with a filled out requisition form to pay them, but they said they required actual cash in hand before they would provide any services.

28.     As Ms. Williams wasn't receiving technical help from Softscape, Mr. Sampson and the IT contractors were the only resources she had to write the actual programs.

29.     Phase 2 of ACIS was scheduled to begin in November 2005. Phase 2.0 was designed to provide information on line about the six additional APRA programs not included in Phase 1.0.  Phase 3, designed to provide information about outside contractors of services to APRA, had been scheduled to begin in February 2006.

30.     By the middle of September 2005, it was obvious that ACIS would not be on line with Phase 2.0 by November 2005.  In fact, Phase 2.0 had not even begun by mid-February 2006.

31.     During her employment at APRA, Ms. Williams learned that Mr. Johnson and

Ms. Shaw were responsible for the ACIS contract with Softscape. Ms. Williams learned it was a single source contract. She learned that Ms. Shaw appears to have signed the contract on behalf of APRA *prior* to receiving official approval from the District's technology office.

32.    The contract was signed by the APRA officials several months before APRA finally convinced the technology office to approve it. The contract was approved in September 2004.

33.    A routine oversight hearing before the Committee on Health of the Council of the District of Columbia was scheduled for February 14, 2006. The Council Committee was headed by Councilman David A. Catania.

34.    In January 2006, about a month prior to the oversight hearing, APRA received a set of questions from the Council to use in preparation for the hearing. The questions covered every program in APRA. The advance questions were sent to the chiefs of the respective programs for answers. Ms. Williams and Mr. Sampson provided written answers to the advance questions about ACIS.

35.    Mr. Johnson was to represent APRA at the oversight hearing. Mr. Anthony, using the staff answers to the questions, briefed Mr. Johnson to prepare him for the hearing.

36.    All APRA's senior management personnel were expected to attend the oversight hearing so if Mr. Johnson was not sure how to respond to a question put to him, the manager directly responsible would be available to assist. Generally, managers at Ms. Williams's level of responsibility would not be expected to testify at an oversight hearing. Ms. Williams was told there was a small chance that Ms. Williams could be called to testify at the oversight hearing. However, Ms. Williams was not provided with any instructions or preparation should

be she called to testify.

37.     Ms. Williams sat in the back of the room for most of the hearing. DOH Director, Dr. Gregg A. Payne, and Mr. Johnson sat at witness table. Near the end of the hearing, Mr. Catania started asking questions about ACIS. Mr. Johnson beckoned Ms. Williams to come to the witness table.

38.     Only Mr. Catania asked questions about ACIS and he directed many of them to Ms. Williams, who answered all of the questions truthfully and to the best of her ability.

39.     Ms. Williams's answers were short and concise and her testimony lasted 15 to 20 minutes.

40.     Mr. Catania asked Ms. Williams who was in charge of ACIS. Ms. Williams said the new technology system was put into her division and that she was responsible for its implementation.

41.     Mr. Catania asked what type of specific information was being retrieved by the new system. Ms. Williams replied that only demographic data could be retrieved at this time.

42.     Mr. Catania was not happy with the lack of progress in view of the large amount of public funds Mr. Catania said had been spent on the system. Mr. Catania said the system should have been completely on line two years earlier. Ms. Williams responded that she hoped that ACIS would be up and running by November 2006. Mr. Catania said if Ms. Williams actually had ACIS operating by the end of 2006, he would personally make sure she received a promotion.

43.     Mr. Catania, *sua sponte,* then raised the issue whether some kind of fraud had taken place within APRA because of the large amount of money involved. Mr. Catania threatened to request a federal fraud and/or False Claims Act investigation of both Softscape and APRA if he learned, as he suspected, that the ACIS contract was not submitted through proper channels and

resulted in the contractor being paid more money than is appropriate for the level of services provided to APRA.

44.    On February 15, 2006, the day following the council hearing, Mr. Johnson sent an e-mail to the managers who had attended the oversight hearing to attend a "debriefing" that same day.

45.    Ms. Williams had attended oversight council hearings quarterly, and never before had there been a "debriefing" following a hearing.

46.    Much of the discussion at the "debriefing" was whether APRA would be the target of a federal fraud investigation.

47.    At the "debriefing," Mr. Johnson blamed Ms. Williams for doing a poor job of answering Councilman Catania's questions. Mr. Johnson told Ms. Williams that her testimony made APRA look like "crooks," and made it appear the agency was doing something wrong.

48.    Mr. Johnson said since the program was under Ms. Williams's division, if anything was found to be wrong, Ms. Williams would be held responsible. Ms. Williams told Mr. Johnson she was not responsible because Ms. Williams was not even present when the contract was let and because Ms. Williams was denied even the basic information about the contracts and had been refused a copy of the contract.

49.    Until the "debriefing," Ms. Williams had a good working relationship with Mr. Johnson. Their relationship immediately underwent a complete change. From the "debriefing" forward, Mr. Johnson was hostile to Ms. Williams and he often shouted at Ms. Williams. On many occasions, Mr. Johnson refused to speak with Ms. Williams, other than a bare "yes" or "no." Mr. Johnson frequently cancelled or postponed his "one-on-one" supervisory sessions with Ms. Williams. Prior to that time, these meetings had been held regularly, every other week. Mr. Johnson

and his Chief of Staff David Anthony began a series of harassing actions described below.

50.     On February 22, 2006, Mr. Johnson called Ms. Williams on the telephone and accused her of being late for a meeting that she had previously been informed was cancelled. Ms. Williams told him she would be there immediately and she hung up the phone to leave for the meeting.  When Ms. Williams  arrived on Mr. Johnson's floor, he brought Ms. Williams into a conference room, closed all the doors and berated Ms. Williams for hanging up on him and threatened to fire her should she hang up on him again.

51.     At the same private conference, Mr. Johnson again accused Ms. Williams of questioning APRA on the Softscape contract and accused Ms. Williams of thinking APRA had done something wrong. He told Ms. Williams he did not think she should be here and told her she should "get out" now if Ms. Williams believed APRA had done something wrong.

52.     On February 23, 2006, Mr. Johnson telephoned Ms. Williams and told Ms. Williams that if she wanted to stay in her job, she needed to learn to be a "team player."  Mr. Johnson told Ms. Williams that he was tired of her asking questions.

53.     About 4:45 p.m. on Friday, February 24, 2006, as Ms. Williams was getting ready to go home, Mr. Johnson called Ms. Williams's office and demanded that she provide him with minutes from a meeting earlier in the week.  Preparation of the minutes was not a part of her job. Mr. Johnson insisted that he needed the minutes by no later than 5:30 p.m. that same evening. Ms. Williams stayed late, typed the minutes and sent them to Mr. Johnson by e-mail about 5:25 p.m.  As Ms. Williams  finished, she looked out of her office window and saw Mr. Johnson leaving the office. Thus, it was evident that Mr. Johnson didn't need the minutes that night and that he was using the demand for minutes as a pretext or opportunity to harass Ms. Williams.

54.     On March 8, 2006, Ms. Williams and her husband met privately for an hour with Mr. Catania and two of his aides to discuss the Softscape contract and Mr. Johnson's harassment of Ms. Williams following her testimony before the Council.  At that meeting, Mr. Catania stated that Ms. Williams  should not be receiving harassment from Mr. Johnson unless he had something to hide.

55.     Mr. Catania told Ms. Williams and her husband that he had tried to get a copy of the ACIS contract from the District Office of Contracts and Procurement, and the contract had not been provided to him.  Ms. Williams told him that she did not have a copy of the contract either.

56.     As a result of the information Ms. Williams brought Mr. Catania's attention, Mr. Catania instructed his staff to launch an investigation into the Softscape contract.

57.     In the middle of March 2006, two aides from Mr. Catania's office came to APRA to look into the circumstances surrounding the award of the ACIS contract to Softscape and Softscape's failure to perform as promised. They began their investigation by asking Mr. Johnson for information and documents relating to the contract.

58.     About March 17, 2006, Mr. Johnson disclosed the existence of the Catania investigation to Ms. Williams.  Mr. Johnson then asked Mr. Sampson and Ms. Williams to provide him with documents to give the council aides.  Mr. Johnson was nervous and upset and stated that he was sick of the Council  looking into the Softscape contract.

59.     During their "one-on-one" supervisory session on March 22, 2006, Mr. Johnson asked whether Ms. Williams had received a telephone call from the personnel department about Ms. Williams's residency status.

60.     On March 30, 2006, Julian Tolver, Risk Manager in the personnel office of the DOH, called Ms. Williams to discuss her residency and they made an appointment to meet on April 3,

2006.

61.    On April 3, 2006, Ms. Williams met in person with Mr. Tolver. He told Ms. Williams that Mr. Johnson, Mr. Anthony and Carol Ware, the chief of the Quality Improvement Division of APRA, came to his office and presented him with documentary evidence they had collected about Ms. Williams.  Mr. Johnson and Mr. Anthony accused Ms. Williams of violating a statutory requirement that she remain a resident of the District of Columbia.

62.    Ms. Williams had not been advised that she was hired because of a residency preference and she was never told that maintaining a residence in the District of Columbia was a condition of her continued employment at APRA.

63.    Mr. Johnson and Mr. Anthony presented Mr. Tolver with documents from the Department of Motor Vehicles that were not open to public inspection, including a copy of a letter with Ms. Williams's return address.

64.    Mr. Tolver informed Ms. Williams that he learned from Mr. Johnson stated that Mr. Anthony previously worked at the District's Department of Motor Vehicles and that Mr. Anthony used his contacts at his former agency to obtain Ms. Williams's private records.  Mr. Tolver told Ms. Williams that the tactics used by Mr. Anthony were a form of "identity theft."

65.    Mr. Tolver also told Ms. Williams that in complaining about Ms. Williams's residence he believed APRA was singling out Ms. Williams out for reasons that were unrelated to her residence.  Mr. Tolliver told Ms. Williams that he would not bring the complaint against her without getting clearance from his supervisor.

66.    In mid-April 2006, Mr. Tolver called Ms. Williams at home and told Ms. Williams that he was requesting a dismissal of the complaint against Ms. Williams because the District did

not comply with its own rules and regulations in that it failed to give Ms. Williams the required notification of a residency requirement. Nevertheless, DOH proceeded with the complaint.

67.    In approximately April 2006, Mr. Anthony volunteered information to Dorothy Smith who is a union steward and a Public Health Technician at DOH that he was going to fire one of his managers, Christina Williams. Mr. Anthony told Ms. Smith that Ms. Williams was not on good terms with her boss Mr. Johnson because of her testimony before the District Council. Mr. Anthony said that Mr. Johnson was unhappy and displeased about the things Ms. Williams said at a hearing before Councilman Catania. Mr. Johnson said that Ms. Williams "talked too much" and revealed things to Councilman Catania that Mr. Johnson did not want disclosed.

68.    On May 1, 2006, the DOH issued a Notice to Show Cause why Ms. Williams's position should not be forfeited and why she should not be fired due to her alleged non-compliance with the D.C. residency preference requirement. Mr. Anthony personally served Ms. Williams with the Notice to Show Cause on May 2, 2006.

69.    After an evidentiary hearing was held on June 19, 2006, the District's Director of Personnel dismissed the Notice to Show Cause because DOH failed to prove that Ms. Williams's position was subject to a residency requirement and/or failed to prove that Ms. Williams had been advised she was required to remain a resident of the District after she was hired. The Office of Personnel vindicated Mr. Tolver's analysis. The Notice to Show Cause was dismissed on August 8, 2006.

70.    After Mr. Johnson learned that Ms. Williams was not going to be removed for a residency violation, he offered to try to find Ms. Williams a job elsewhere. Mr. Johnson became even more hostile to Ms. Williams when she declined to look for other employment.

71.     On August 29, 2006, Mr. Johnson publicly berated Ms. Williams at a meeting attended by APRA's executive team.

72.     On September 26, 2006, Mr. Anthony told Ms. Williams that as an MSS employee with a grade level of 15, she was considered an "at will" employee who can be fired without cause and without warning just by the agency writing a letter. He threatened Ms. Williams with firing because he claimed she was not a "team player."

73.     On October 4, 2006, during what was scheduled as a "one-on-one" supervisory session but was attended by two other members of Mr. Johnson's staff as well as by Ms. Williams and Mr. Johnson, Mr. Johnson accused Ms. Williams of being late with APRA's principal grant proposal.  The information he relied upon in his accusation was inaccurate. Ms. Williams  denied that she was late with the grant proposal, and Ms. Williams  set forth the facts in detail.

74.     On October 10, 2006, Ms. Williams  received a memo from Mr. Johnson, again reciting the same faulty information that she was late in filing the block grant application and accusing Ms. Williams of poor management. Mr. Johnson demanded a written statement from Ms. Williams by October 13, 2006, regarding her staff's major tasks and accomplishments for the six-month period from April through September 2006.

75.     Beginning by about mid-May 2006, Mr. Johnson removed the responsibility for implementing the ACIS project from Ms. Williams without even having the courtesy to inform Ms. Williams that she was losing her duties.  Mr. Johnson directed the contractors working on ACIS to report directly to Mr. Johnson and to no longer report to Ms. Williams.  Mr. Johnson put nothing in writing about the transfer of duties from Ms. Williams.

76.     By early June, ACIS was completely out of Ms. Williams's direction, and Ms.

Williams's staff had shrunk from ten persons to four.

77.     Mr. Johnson did not give Ms. Williams and her staff any further tasks to perform, even after Office of Personnel determined that Ms. Williams did not violate any residency preference requirements.  The four people Ms. Williams supervises currently have very little work to do now.

78.     In April 2006, Mr. Johnson moved Ms. Williams and her staff out of her office at 1300 First Street, N.W. to a less desirable office down the hall.   Ms. Williams's former office was left vacant, confirming that there was no business reason for the move and that this was another form of harassment.

79.     Before moving Ms. Williams to less desirable office at 1300 First Street, Mr. Johnson pressured Ms. Williams to move to an office on the second floor at the back of the building at 33 N Street, N.W.

80.     The proposed office at 33 N Street was unacceptable to Ms. Williams and her staff, since the office was not painted or carpeted.  This proposed office overlooked a smelly garbage dumpster.  The office even lacked telephone lines and facilities for using computers. A container of needles was found in this office space.

81.     Two months later, in July 2006, Mr. Johnson again attempted to force Ms. Williams and her staff  to the second floor back of 33 N Street, N.W.   Mr. Johnson's attempt was blocked when the union members on her staff arranged for their union representative to intervene on their behalf.   Instead, in July 2006, Ms. Williams was moved to an even smaller space at 1300 First Street, N.W.  Since the space was too small for Ms. Williams's entire staff, her staff was split up.

82.     On or about August 18, 2006, Ms. Williams filed a statutory Notice with the Office

of Risk Management pursuant to §12-309. Shortly after he became aware of Williams' first §12-309 Notice, Johnson began complaining about Ms. Williams' assertion of her rights under the D.C. Whistleblower statute.

83.    At a meeting of the executive team at Williams' office that was held of August 29, 2006, Johnson objected to Williams' efforts to exercise her statutory rights, telling her the he did not take to threats very well. Johnson told Williams that I don't want to see you fired, but "I will hurt you." During the same conversation in the same meeting, Johnson told Williams that he grew up in a rough part of Richmond, Virginia and that he was "not a nice guy." Johnson intended to harass and intimidate Williams.

84.    In September 2006, Ms. Williams was again pressured to move to the unacceptable space at 33 N Street, N.W. This time, the space was painted and carpeted and telephone lines and computer modems installed. The move took place in early October 2006.

85.    In the middle of September 2006, Ms. Williams's assigned parking space was taken from her. Ms. Williams's attempts to have her parking rights restored did not succeed.

86.    Ms. Shaw is the only other DOH chief besides Ms. Williams's located at 33 N Street, N.W. Ms. Shaw has a large office in the front of the building, and she has six private parking spaces, even though she has a lower grade than Ms. Williams.

87.    Mr. Johnson denied Ms. Williams the use of a a Blackberry, a privilege given to other managers, including those at lower levels..

88.    In mid-October, 2006. Mr. Johnson requested the "form letter" for terminating MSS employees from the DOH Personnel Office in order to prepare a letter terminating Ms. Williams.

89.    Mr. Johnson continues to seek permission to lower Ms. Williams's performance

evaluation. Although his efforts have been delayed because Ms. Williams' prior performance evaluation exceeds "outstanding," defendant Johnson seeks to gave Ms. Williams a lower performance evaluation for the most recent year because she engaged in protected activity.

90.     Ms. Williams has heard nothing about the investigation by Councilman Catania's aides since March 2006. However, on October 16, 2006, representatives of the accounting firm KPMG began a review of the administration at APRA.

91.     As part of the KPMG investigation, the auditors requested a copy of the ACIS contract with Softscape. Ms. Williams understands that the auditors from KPMG were not provided with a copy of the Softscape contract

92.     Mr. Johnson directed a subordinate to audit Ms Williams's time and attendance records from May, 2006 to the present in order to see if her could locate any discrepancies.

93.     Mr. Johnson interfered with Ms. Williams's claim for workers compensation arising out of the carpal tunnel syndrome she suffered and he caused her claim to be delayed..

94.     During the October 2006 oversight hearing, Councilman Catania asked the person assigned to the Softscape contract, "Where is Chris Williams"? Mr. Catania also asked: "Do you know what you are getting into"?

95.     On October 20, 2006, Mr. Johnson told Ms. Williams he was terminating her employment. After he told Ms. Williams that he was going to have her fired, he said he had not reached a final decision but he stated that he was "seriously thinking about" terminating Ms. Williams's employment.

96.     It is common knowledge at APRA that Johnson is trying to fire Williams because of what she said to the D.C. Council.

97.     Allowing Ms. Williams to be fired would have a chilling effect on the many APRA employees who know about Ms. Williams' testimony before the D.C. Council and would discourage other employees from speaking candidly about the operations of the government or testifying before the D.C. Council.

## COUNT I
## VIOLATION OF THE FIRST AMENDMENT OF THE U.S. CONSTITUTION

98.     Plaintiff repeats and incorporates by reference the allegations contained in Paragraphs 1 through 97, above.

99.     When Ms. Williams testified before Council member Catania's Council Committee, and when she met with Mr. Catania to discuss contracting irregularities, Ms. Wiliiams was speaking on matters of public interest and public concern when she testified and when she provided truthful information regarding government contract.

100.     Ms. Williams's interest as a citizen in speaking out on such matters of public concern serves the public interest because the subject was reporting waste, fraud, abuse of authority, violations of law, and threats to public health and safety.

101.     Ms. William's interest as a citizen in speaking out on such matters of public concern outweighs the interest, if any, of stifling public speech under the pretense that doing so allegedly promotes the efficiency of the public service.

102.     Ms. Williams's exercise of her First Amendment rights was a substantial or motivating factor in the adverse actions taken against her by defendants Johnson and Anthony, who would not have taken these adverse actions had Ms. Williams not engaged in activity protected under the First Amendment of the Constitution.

103.    As a direct and proximate result of the defendants' actions, Ms. Williams suffered emotional distress, embarrassment, anxiety, fatigue, mental distress, humiliation, illness and damage to her employment and personal reputation and incurred attorney's fees in connection with defendants' unsuccessful attempt to terminate her employment on bogus charges of violation of the D.C. Residency Preference Act.

104.    Individual defendants Johnson and Anthony acted maliciously, willfully, wantonly and in reckless disregard of Ms. Williams's Constitutional rights.

## COUNT II
## VIOLATION OF THE D.C. WHISTLEBLOWER ACT

105.    Plaintiff repeats and incorporates by reference the allegations contained in Paragraphs 1 through 104, above.

106.    When Ms. Williams provided truthful testimony at a public haring before the D.C. Council and later provided information to D.C. Councilman Catania, Williams was making a "protected disclosure" under the D.C. Whistleblower statute, D.C. Code §1-615.52(a)(6). Williams reasonably believes this truthful testimony and information evidences "Gross mismanagement;" "Gross misuse or waste of public resources or funds;" "Abuse of authority in connection with the administration of a public program or the execution of a public contract;" and/or "A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature."

107.    Defendants Johnson and Anthony took and/or threatened to take "prohibited personnel actions," as defined in the Whistleblower Act §1-615.52(a)(5), and otherwise retaliated

against her because of Ms. Williams's protected activity.  These actions included recommended, threatened, or actual termination, demotion, suspension, or reprimand;  involuntary transfers, reassignments, or detail;  retaliation in the manner described above.

108.    The D.C. Whistleblower Act guarantees that District employees have the right to communicate freely and openly with the members of the Council.  D.C. Code §1-615.58 and to disclose information that is illegal or unethical or that threatens public funds and public health and safety without fear of retaliation.

109.    Ms. Williams's exercise of her whistleblower rights was a contributing factor in the adverse actions taken against her by defendants the District of Columbia and Robert Johnson and David Anthony.  The District would not have taken these adverse actions against Ms. Williams had she not engaged in activity protected under the D.C. Whistleblower Act.

110.    As a direct and proximate cause of the defendants' actions, Ms. Williams suffered emotional distress, embarrassment, anxiety, fatigue, mental distress, humiliation, illness and damage to her employment and personal reputation and incurred attorney's fees in protecting herself against defendants' unlawful actions.

## RELIEF REQUESTED

A.    Declare that defendants' policies and practices and actions, as described above, violate the First Amendment of the Constitution of the United States and the D.C. Whistleblower Act.

B.    Enjoin defendants from engaging in employment practices and procedures that operate to violate Ms. Williams's rights under the First Amendment and the D.C. Whistleblower Act..

C.     Award Ms. Williams compensatory damages in the amount of $3 million for emotional distress, embarrassment, humiliation, anxiety, mental anguish, and loss of reputation within her work community, and violation of civil rights under the First Amendment and the D.C. Whistleblower Act.

D.     Award Ms. Williams punitive damages in the amount of $1 Million against the individual defendants for violations of the First Amendment of the Constitution of the United States

E.     Award Ms. Williams her costs, expenses, and reasonable attorney's fees incurred in defending herself against defendants' unlawful actions in trying to terminate her and in this litigation; and

F.     Grant Ms. Williams such other and further relief as the Court may consider just and proper.

Respectfully submitted,

_____
John F. Karl, Jr. #292458
Karl & Tarone
900 17th Street, NW, Suite 1250
Washington, DC 20006
202.293.3200
202.429.1851 (fax)
Counsel for Plaintiff

**JURY DEMAND**

Plaintiff demands a trial by jury

_____
John F. Karl, Jr. #292458

# EXHIBIT A

# Government of the District of Columbia
## Performance Management Program
### *Performance Evaluation*

| | | | |
|---|---|---|---|
| **Employee Name:** | CHRISTINA WILLIAMS | | |
| **Position Title:** | RESEARCH EVAL AND GRANTS OFR | **Grade:** | 15 |
| **Agency:** | Department of Health | | |
| **Employee Type:** | Full-Time/Mgmt Supvr Service | **Supervisor:** | ROBERT L JOHNSON |
| **Performance Plan Period:** | 10/1/2004 to 9/30/2005 | **Type of Evaluation:** | Annual |
| **Date:** | 11/15/2005 | **Rating:** | 4 |

To report inaccuracies in the above personal data, please contact your agency's HR Advisor.

## Rating Scale

| | |
|---|---|
| **5 - Significantly Exceeds Expectations** | Performance consistently and significantly exceeds expectations. Exceptional accomplishments obvious to manager and peers. |
| **4 - Exceeds Expectations** | Performance consistently exceeds expectations in some areas and meets expectations in all others. |
| **3 - Meets Expectations** | Performance consistently meets key expectation and may occasionally exceed expectations. |
| **2 - Needs Improvement** | Performance meets some expectations but requires further development in one or more areas. Formal action should be taken to ensure improved performance. |
| **1 - Does Not Meet Expectations** | Performance consistently does not meet expectations. Formal action should be taken to ensure improved performance. |

## STEP I:  Evaluate Competencies
*Use the five-point rating scale to rate employee's performance relative to each competency.*
*Comments must be included to support performance ratings.*

View the Competency definitions

**1. Communication -** Presents ideas and information both verbally and in writing in a clear, concise manner. Shares the information people need to know to be successful. Informs others on a timely basis. Consistently shows a great deal of understanding, courtesy, tact, empathy, and concern when addressing others. Demonstrates very effective listening, questioning skills.

| Comments | Rating |
|---|---|
| As the bureau chief of the research center Ms. Williams tasks include the expectation of clearly written ,well-delivered information on substance use disorders. While she speaks quite well publicly, her written work needs improvement. I have sent work back to her before because the word tense was incorrect and/or the content was inadequate. This is an area that needs greater committment on her part to rectify.Ms. Williams works as a team player and routinly displays empathy, tact, courtesy and understanding when addressing others. | 3 |

**2. Customer Service -** Demonstrates a commitment to working with customers both internal and external customer. Demonstrates consistent and continual adherence to all prescribed District Customer Service goals and standards (i.e., telephones, voicemail, correspondence, etc.) Establishes and maintains good customer relations by working with customers to get information, assess needs, and resolve issues and concerns. Demonstrates commitment to providing high quality and timely service. Continuously assesses service delivery performance from the customers' point of view.

| Comments | Rating |
|---|---|
| As the Chief of Research, Ms. Williams has demonstrated above average commitment to working with internal and external customers. Her efforts at creating an effective, robust, new information system with internal stakeholders (DC's Office of Technology) and external stakeholders (Softscape Company) to incorporate a new client information system within APRA, has been very successful. | 4 |

**3. Dependability -** Maintains an excellent record of attendance/punctuality and plans absences in advance. Keeps promises and commitments. Consistently completes projects accurately and on time and is very thorough when performing work and conscientious about attending to detail.

| Comments | Rating |
|---|---|
| During the past year, Ms. Williams attendance and punctuality records hasbeen satisfactory.The major grant application was not presented to the senior deputy director in August as promised, but Ms. Williams did show diligence in helping ensure the application get delivered within the dealine to the funding agency. | 3 |

**4. Flexibility/Adaptability -** Responsive and adaptive to new information and/or events. Committed to ongoing improvement in work processes and adapts behavior or work methods in response to new information, changing conditions or unexpected obstacles. Effective at dealing with and making sense of uncertain situations.

| Comments | Rating |
|---|---|
| Ms. Williams have been responsive and adaptive to new information and events.She has experienced a great amount of staff uncertainty over the past year. She has impressed with her ability to create a team with personnel who are not technically as sound in the area of information technology as is needed. | 4 |

**5. Initiative -** Works to remedy problems without being told by a peer or supervisor. Persistent in overcoming obstacles. Sees what needs to be done and does it. Consistently seizes opportunities when they arise and produces quality work products under minimal supervision.

| Comments | Rating |
|---|---|
| Ms. Williams does not require a great deal of supervision and is a self starter.She has fostered a very good working relationship with OCTO and has been instrumental in ensuring that APRA receives the maximum amount of assistance from them. | 4 |

**6. Integrity and Trust -** Is trusted by others. Is seen as a direct and truthful individual and keeps confidences of others. Does not misrepresent him/herself for personal gain. Displays high standards of ethical conduct and understands the impact of violating these on the organization, self and others.

| Comments | Rating |
|---|---|
| Ms. Williams is trusted by her peers and subordinates. Her committment to quality services is evidenced by her work on the new APRA release of information form which gives the greatest protection we can to our clients. | 4 |

**7. Job Knowledge -** Consistently executes the duties and responsibilities of his or her position in an efficient and accurate manner. Clearly understands and uses knowledge that is acquired through formal training or extensive on-the-job experience to perform duties and responsibilities. Is effective in working with, understanding, and evaluating technical information related to the job. Effectively uses machines, tools, or equipment.

| Comments | Rating |
|---|---|
| Ms. Williams understands the duties and responsibilities of the position of Chief of the Research Center. Ms. Williams has enhanced her knowledge of her position through attending trainings on relevant various policies and procedures as it relates to the research center. Ms. Williams past experience in research also allows her to understand her job duties. | 4 |

**8. Professionalism -** Focuses on work-related activities and acts in ways that support the goals, direction and standards of the District. Deals calmly and effectively with stress, and is a settling influence in a crisis. Builds and maintains successful working relationships with colleagues and consistently meets performance and commitment requirements or agreements.

| Comments | Rating |
|---|---|
| Ms. Williams brings a calming influence to the workplace which greatly enhances her effectiveness within the agency. An example is her calm handling of an irate employee who was upset at her office space and behaved inappropriately in a public setting. Ms. Williams was able to meet with the staff person, counsel her on a better approach and suggest a way to rectify the situation. The employee later apoligized for the outburst. Ms. Williams builds on relationship with colleagues to maintain a healthy working environment and is well respected by her peers. | 5 |

**9. Resource Usage -** Conserves District resources and uses them efficiently (e.g., supplies, equipment, vehicles, uniforms, technology, etc.). Consistently completes all assigned projects within budget and gains approval if project will exceed budget.

| Comments | Rating |
|---|---|
| At this time, the Research Center does not have a budget to work from. The major project for the center is the ACIS initiative. Ms. Williams has been successful in ensuring that this 2 million dollar project meets all of it's timelines and deliverables. | 5 |

**10. Teamwork -** Encourages a participative approach to work, fostering cooperation, pride, dialogue, and trust. Creates strong spirit and morale. Lets people finish and be responsible for their work. Defines success in terms of the whole team and creates a feeling of belonging among team members. Works well with others to achieve team goals. Consistently places team priorities before personal priorities.

| Comments | Rating |
|---|---|
| Ms. Williams is a team player and encourages her staff to respond in that manner. Ms. Williams work well with others to achieve certain goals and consistently places team priorities before personal priorities. I would like to see her take a more active role at the leadership meetings in the area of data potentials that are being missed. | 4 |

*Include the following competencies for supervisors only*

**11. Conflict Management -** Accepts responsibility for effectively managing and resolving conflicts, confrontations, and disagreements in a positive and constructive manner to minimize adverse impact. Employs strong conflict management and people management skills to ensure an effective workplace.

| Comments | Rating |
|---|---|
| As noted above, Ms. Williams handles conflicts very well. There have been no circumstances that have risen to my notice of unresolved conflicts between her and others. Her interpersonal skills are very good and she works very well with her staff and peers. | 4 |

**12. Leadership -** Inspires, motivates, guides others toward goals. Coaches, mentors and challenges staff and adapts leadership style to various situations. Consistently demonstrates decisiveness in day-to-day actions. Takes unpopular positions when necessary. Faces adversity head on. Rallies support to accomplish tasks.

| Comments | Rating |
|---|---|
| Ms. Williams comes to APRA with strong leadership skills and inspires, motivates and guide others to achieve goals. She has worked very effectively with the data specialist to create new measures for the ACIS system that will position APRA to report outcomes by FY07. Ms. | |

| | |
|---|---|
| Williams consistently demonstrates decisiveness in her day to day actions. Adversity with her center has been handled creatively. An example would be her lack of full staffing for her center. Ms. Williams has been able to use staff creating, such as her assistant, to ensure that the work of her center gets done efficiently. | 4 |

**13. Managing People -** Provides ongoing guidance and positive reinforcement to improve performance. Provides challenging tasks and assignments and will work with people who need improvement. Consistently evaluates, provides feedback and develops employees to their next level of performance. Shares and/or delegates power and authority with staff. Shares rewards with staff. Provides corrective and/or progressive disciplinary actions to modify/improve inappropriate behavior or performance. Ensures staff are properly selected, used, appraised and developed, and are treated fairly. Effective at managing a diverse workforce.

| Comments | Rating |
|---|---|
| Ms. Williams manages a total of nine individuals including three contractors. Ms. Williams provides ongoing guidance and positive reinforcement by sending staff to workshops and conferences to improve the skills which lead to improvedperformance. Ms. Williams consistency provides feedback to improve level of performance. The mission of her office was enhanced when she provided a luncheon retreat for her staff. This resulted in much greater buy-in by the staff. Ms. Williams routinely exhibits cultural competence as she supervises a diverse workforce that has had few if any complaints about the workplace. She conducts weekly staff meetings that keeps all informed and involved with new changes and challenges. | 5 |

**14. Operations Planning and Evaluating -** Anticipates and adjusts for potential problems or opportunities. Implements or utilizes strategic plans on a day-to-day basis. Organizes work, sets priorities, determines resource requirements. Determines short- or long-term goals and strategies to achieve them. Coordinates with other parts of the organization. Monitors progress and evaluates outcomes.

| Comments | Rating |
|---|---|
| The work of the research center requires good strategic skills. The development of a software system for the district is being undertaken by Ms. Williams center. This 2 year plan has met its timelines thus far due in large part to her planning.She has a task list that is visible to her staff which outlines the status of the projects they are involved with. This has been very effective in keeping everyone on task. | 4 |

**15. Strategic Planning -** Has broad knowledge and perspective on the strategic issues facing the District. Can anticipate future consequences and trends accurately and create improvement strategies and plans. Consistently makes sound, well-informed decisions. Clearly understands the impact and implications of decisions.

| Comments | Rating |
|---|---|
| In the past year Ms. Williams havs participate in the APRA strategic planning, by attending working shops on the strategic plan and supplying goals and outcomes to be incorporates into the strategic plan. | 3 |

**TOTAL COMPETENCY RATING**

The "Total Competency Rating" = Total rating points scored ÷ Number of competencies rated.

| | |
|---|---|
| | 4 |

## STEP II: Evaluate S.M.A.R.T. Goals
*User the five-point rating scale to rate employee's performance relative to each S.M.A.R.T. goal. Include comments to support performance ratings.*

| Goal #1 | | |
|---|---|---|
| Complete the hiring and organization of the Research, Evaluation and Grants Center. | | **Weight (A)** |
| | | 25% |
| | | **Rating (B)** |
| **Due Date:** | 6/30/2005 | 5 |

| Comments: | Weighted Rating (AxB) |
|---|---|
| The Research Center completed the hiring of a data manager in March, 2005 and in May, 2005 hired three contrators to work in the Information Technology area. | 1.25 |

### Goal #2

| Completion of selected, primary data domain indicators in order to capture essential outcomes. | Weight (A) |
|---|---|
| | 25% |
| | Rating (B) |
| Due Date: | 6/30/2005 | 5 |

| Comments: | Weighted Rating (AxB) |
|---|---|
| The Research center captured the data outcome measures during this fiscal year, by providing the on-line web -based Client Information System to APRA's Detox Center, in June 2005 and processing client's information from records into the computer system. | 1.25 |

### Goal #3

| Submit a minimum of four grant applications to increase APRA funding this fiscal year | Weight (A) |
|---|---|
| | 25% |
| | Rating (B) |
| Due Date: | Ongoing | 3 |

| Comments: | Weighted Rating (AxB) |
|---|---|
| The Research Center completed three grants for the past fiscal year. The SAMHSA Block grant was completed and submitted prior to the due date, which resulted in a $6.6 million grant to APRA and Februray, 2005 submitted grant to SAMHSA for youth treatment, which resulted in funding of $400,000 to the Youth and Prevention Treatment Division. One grant to NDIA was not funded. | 0.75 |

### Goal #4

| Complete needs assessment for APRA programs. | Weight (A) |
|---|---|
| | 25% |
| | Rating (B) |
| Due Date: | 9/30/2005 | 3 |

| Comments: | Weighted Rating (AxB) |
|---|---|
| The Research Center completed a needs assements with social indicator and maps for APRA programs, with the assistance from an outside contractor. | 0.75 |

### Goal #5

| | Weight (A) |
|---|---|
| | 0% |
| | Rating (B) |
| Due Date: | | 0 |

| Comments: | Weighted Rating (AxB) |
|---|---|
| | 0 |

**TOTAL S.M.A.R.T. GOAL RATING**    4

The "Total S.M.A.R.T. Goal Rating" = The sum of the weighted goal ratings.

| Employee's Comments: |
|---|
|  |

## STEP III:  Overall Performance Rating

*Determine the Overall Performance Rating that consists of 40% of total competency rating and 60% of total S.M.A.R.T. goal rating.*

**OVERALL PERFORMANCE RATING**

The "Overall Performance Rating" = (Total Competency Rating x .4) + (Total S.M.A.R.T. Goal Rating x .6)    | 4 |

| Performance Rating Calculation | Overall Performance Rating | Performance Category |
|---|---|---|
| > 4.4 | 5 | Significantly Exceeds Expectations |
| > 3.4 | 4 | Exceeds Expectations |
| > 2.4 | 3 | Meets Expectations |
| > 1.4 | 2 | Needs Improvement |
| <= 1.4 | 1 | Does Not Meet Expectations |

*\* This table was revised during FY 2004 to provide a more precise description of the way that the Online PMP system calculates the overall rating. The actual formula used by the Online PMP system to calculate the overall rating remains unchanged. No ratings from any previous Annual or Mid-Year Evaluations have changed as a result of these revisions.*

**Section IV: Signatures**
*By signing this document, you acknowledge that both the supervisor and the employee have reviewed the Performance Plan.*

| By signing this document, you acknowledge that both the supervisor and the employee have reviewed the Performance Plan. | | |
|---|---|---|
| Employee Name: CHRISTINA WILLIAMS | Title: CHIEF OF RESEARCH COUNCIL | |
| Employee Signature: Christina Williams | Date: 12-7-05 | |
| Supervisor Name: Robert L. Johnson | Title: SDD | |
| Supervisor Signature: RL Johnson | Date: 12/5/05 | |

06- 2076
CKK

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

**I. (a) PLAINTIFFS**

Christina Conyers Williams

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA
2006 DEC -4 PM 4: 15
MAYER-WHITTINGTON
CLERK

**DEFENDANTS** Robert Johnson, David Anthony, and the District of Columbia

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Montgomery
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT unknown
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LA...

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMI

John F. Karl, Jr   200
Karl & Tarone
900 17th St NW DC 200

CASE NUMBER   1:06CV02076

JUDGE: Colleen Kollar-Kotelly

DECK TYPE: Employment Discrimination

DATE STAMP: 12/05/2006

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☑ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in item III)

**III CI**
FOR PI

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| □ **G.** *Habeas Corpus/ 2255* | ☑ **H.** *Employment Discrimination* | □ **I.** *FOIA/PRIVACY ACT* | □ **J.** *Student Loan* |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | ☑ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| □ **K.** *Labor/ERISA (non-employment)* | □ **L.** *Other Civil Rights (non-employment)* | □ **M.** *Contract* | □ **N.** *Three-Judge Court* |
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☑ 1 Original Proceeding    □ 2 Removed from State Court    □ 3 Remanded from Appellate Court    □ 4 Reinstated or Reopened    □ 5 Transferred from another district (specify)    □ Multi district Litigation    □ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Violation of Rights under the First Amendment

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS    □ ACTION UNDER F.R.C.P. 23    **DEMAND $** $5 Million    Check YES only if demanded in complaint    **JURY DEMAND** ☑ YES    □ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    □ YES    ☑ NO    If yes, please complete related case form.

DATE Dec 4, 06    SIGNATURE OF ATTORNEY OF RECORD    John F. Karl, Jr.

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

