UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHRISTINA CONYERS WILLIAMS

  Plaintiff,

    v.

ROBERT JOHNSON, *et al.*

  Defendants.

Civil Action No. 06-2076 (CKK)

**MEMORANDUM OPINION**
(March 14, 2008)

Plaintiff, Christina Conyers Williams, brings this action against the District of Columbia, and her supervisors Robert Johnson, individually and as Senior Deputy Director of the Addiction Prevention and Recovery Administration ("APRA") of the District of Columbia Department of Health ("DOH"), and David Anthony, individually and as Chief of Staff to the Senior Deputy Director of APRA (collectively "Defendants"). Plaintiff alleges that Defendants violated her rights under the First Amendment and the District of Columbia Whistleblower Protection Act ("WPA"), 1-615.01 *et seq.*, by retaliating against her for her remarks during testimony before the District of Columbia Council ("D.C. Council") and during a separate meeting with a D.C. Councilman. Defendants have moved to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6). Upon a searching review of Defendants' Motion, Plaintiff's Opposition, Defendants' Reply, and the relevant statutes and case law, the Court shall GRANT-IN-PART and DENY-IN-PART Defendants' Motion to Dismiss. Specifically, the Court concludes that Plaintiff cannot state a First Amendment claim based upon her testimony before the D.C. Council, and shall therefore dismiss Count I of Plaintiff's First Amended Complaint

insofar as it relies upon that testimony.  The Court shall also dismiss any potential WPA claim

against Defendants Johnson and Anthony in their individual capacity.  The Court shall deny the

remainder of Defendants' Motion to Dismiss.

## I: BACKGROUND

A.    *Plaintiff's Employment and the ACIS Contract*

Plaintiff, Christina Conyers Williams, was hired by the APRA in June 2004, and in

February 2006 held the position of Chief of the Center of Research Evaluation and Grants

("CREG").  Am. Compl. ¶ 5.[1]  Defendant Robert Johnson served as Plaintiff's immediate

supervisor, and Defendant David Anthony was Mr. Johnson's assistant and Chief of Staff.  *Id.* ¶¶

7-8.  According to Plaintiff, she had a good working relationship with Mr. Johnson prior to

February 2006, *id.* ¶ 49, and her November 2005 performance evaluation, which Mr. Johnson

completed, rated her as exceeding expectations overall and significantly exceeding expectations

with respect to certain performance areas, *id.* ¶ 13, Ex. A.

In April 2005, Plaintiff was assigned the task of implementing APRA's Client

Information System ("ACIS") software, which was purchased from Softscape, Inc. ("Softscape"),

and designed to capture statistical data regarding APRA's clients, providers, and local

contractors.  *Id.* ¶ 18.  Although the software had been scheduled to go on line in February or

---

[1] It is unclear from Plaintiff's First Amended Complaint ("Am. Compl.") whether Mr. Johnson and Mr. Anthony are still employed by the APRA, or whether Plaintiff herself is still employed by the APRA.  *See* Am. Compl. ¶ 100 (identifying another individual as the "Interim Deputy Director of APRA" as of March 2007, and alleging that Plaintiff was advised that her position was being abolished effective April 1, 2007).  The D.C. Department of Health website does not list either Mr. Johnson or Mr. Anthony in its "APRA Key Staff Directory."  *See* APRA Key Staff Directory, http://doh.dc.gov/doh/cwp/ view,a,1374,q,603235.asp.  Nevertheless, the Court describes the facts as they are alleged in Plaintiff's First Amended Complaint.

March 2005, little work had been done to that end when Plaintiff was assigned to implement the

software. *Id.* ¶ 20.  Getting ACIS on line became Plaintiff's primary job responsibility, *id.* ¶ 17,[2]

and her staff grew by four employees, three contract employees and an IT specialist, *id.* ¶ 21.

Plaintiff alleges that upon assuming responsibility for the ACIS project and throughout 2006, she

repeatedly requested a copy of the Softscape contract from Pamela Shaw, the employee

previously responsible for it, as well as from Mr. Johnson.  *Id.* ¶¶ 19, 22-24.  According to

Plaintiff, her requests were denied, and as a result she "has not received a precise explanation of

what tasks Softscape is required to perform under the terms of the contract and how much

Softscape is entitled to be paid for services it performs."  *Id.* ¶¶ 23-24.

Phase 1.0 of ACIS was intended to provide information about the experiences of clients

at the detoxification unit at D.C. General Hospital.  *Id.* ¶ 25.  According to Plaintiff, Phase 1.0

went on line in June 2005, but did not work very well.  *Id.* ¶ 26.  Plaintiff therefore sought

technical help from Softscape, which delayed responding, and then refused to do any work on

ACIS until it was paid $175,000 cash in hand.  *Id.* ¶¶ 26-27.  Phase 2.0 of ACIS was scheduled to

begin in November 2005, and provide information about six APRA programs not included in

Phase 1.0, while Phase 3.0 was scheduled to begin in February 2006 and provide information

about outside service contractors.  *Id.* ¶ 29.  According to Plaintiff, by the middle of September

2005, it was obvious that Phase 2.0 of ACIS would not be on line by November 2005, and in

---

[2] Plaintiff asserts that her "formal job description" required her to "direct the day-to-day activities of the [CREG] staff in research analysis, contract administration, information system development, data management, and grants administration, as well as  "provide her findings to senior executive personnel in the District government, to plan and prepare technical reports, and from time to time to represent APRA in contacts with federal officials, District of Columbia agencies and private and civic groups and organizations."  Am. Compl. ¶ 15.

fact, Phase 2.0 had not even begun by February 2006.  *Id.* ¶ 30.

        **B.**      *February 14, 2006 D.C. Council Meeting and its Ramifications*

A routine oversight hearing before the D.C. Council Committee on Health, headed by Councilman David A. Catania, was scheduled for February 14, 2006.  *Id.* ¶ 33.  In advance of that hearing, APRA received a set of questions covering every program in APRA, which were forwarded to the chief responsible for each program.  *Id.* ¶ 34.  Plaintiff alleges that she and her IT specialist provided answers to the questions about ACIS, including that Phase 2.0 would not be completed before November 2006.  *Id.*  Nevertheless, according to Plaintiff, Mr. Johnson represented to the D.C. Council that Phase 2.0 would be complete by June 2006.  *Id.*

Mr. Johnson was to represent APRA at the oversight hearing, and Mr. Anthony briefed Mr. Johnson in preparation, using the staff answers to the advance questions.  *Id.* ¶ 35.  All APRA senior management personnel (including Plaintiff) were expected to attend the oversight hearing so that they could assist Mr. Johnson in the event that he was unsure how to respond to a question he received.  *Id.* ¶ 36.  According to Plaintiff, she attended oversight hearings quarterly, *id.* ¶ 45, and managers at her level were not generally expected to testify, *id.* ¶ 36.  Nevertheless, Plaintiff "was told there was a small chance that [she] could be called to testify" at the February 14, 2006 hearing.  *Id.*  In fact, towards the end of the hearing, Councilman Catania began asking questions about ACIS, and Mr. Johnson beckoned Plaintiff to the witness table.  *Id.* ¶ 37.  Councilman Catania directed many of his questions about ACIS to Plaintiff, and Plaintiff states that she answered Councilman Catania's questions "truthfully and to the best of her ability."  *Id.* ¶ 38.  According to Plaintiff, her answers were short and concise, and her testimony lasted 10 minutes.  *Id.* ¶ 39.  During that time, Plaintiff testified that: (1) she was responsible for the

4

implementation of ACIS; (2) as of the hearing, ACIS could only provide demographic information; and (3) ACIS would be up and running by November 2006.  *Id.* ¶¶ 40-42.

Plaintiff alleges that her brief testimony was significant because her "disclosure that ACIS could provide only demographic data was a statement that ACIS was a major failure," because "notwithstanding all of the money spent by [the] District on ACIS, the software could not track such crucial information such as education or continuing use of drugs, which was one of the primary goals of the contract." *Id.* ¶ 41.  Plaintiff further alleges that her testimony that ACIS would be operative by November 2006 "was another statement of major failure by the contractor that contradicted the written statement submitted to the Council by Mr. Johnson." *Id.* ¶ 42.  Indeed, according to Plaintiff, following her testimony, Mr. Catania "*sua sponte* . . . raised the issue whether some kind of fraud had taken place within APRA because of the large amount of money involved." *Id.* ¶ 43.

The next day, Mr. Johnson scheduled a debriefing for the managers that attended the oversight hearing, which focused on whether APRA would be the target of a federal fraud investigation.  *Id.* ¶¶ 44-46.  According to Plaintiff, during the debriefing Mr. Johnson accused her of doing a poor job of answering Councilman Catania's questions, told her that her testimony made APRA look like crooks, and threatened that she would be held responsible if anything was found to be wrong with ACIS.  *Id.* ¶¶ 47-48.  Plaintiff describes the debriefing as a drastic change from her previously good working relationship with Mr. Johnson and the beginning of a "series of harassing actions" by Mr. Johnson and Mr. Anthony.  *Id.* ¶¶ 49-50, 52.  According to Plaintiff, Mr. Johnson accused her of thinking that APRA had done something wrong in connection with the ACIS contract, *id.* ¶ 51, told her that she should not be there and could "get out" if she

thought that to be the case, *id.*, told Plaintiff that he was tired of her asking questions, and told

her that if she wanted to stay in her job, she needed to learn to be a "team player," *id.* ¶ 52.

      C.     *Plaintiff's Private Meeting With Councilman Catania and its Ramifications*

      On March 8, 2006, Plaintiff and her husband met "privately" for an hour with

Councilman Catania and two of his aides "to discuss the Softscape contract and Mr. Johnson's

harassment of [Plaintiff] following her testimony before the Council." *Id.* ¶ 54.  According to

Plaintiff, Councilman Catania told Plaintiff and her husband that he had tried to get a copy of the

ACIS contract and had not been provided with one. *Id.* ¶ 55.  Plaintiff responded that she did not

have a copy of the contract either and had doubts whether the contract actually existed. *Id.*

Plaintiff asserts that, as a result of the information she provided, Councilman Catania instructed

his staff to launch an investigation into the Softscape contract. *Id.* ¶ 56.  That investigation began

in the middle of March 2006 and Plaintiff alleges, on information and belief, that at that time

"Mr. Johnson became aware that [Plaintiff] met with Councilman Catania and he concluded that

Councilman Catania started the investigation because of [Plaintiff's] testimony before the

Council and her statements to him during their private meeting in mid-March, 2006." *Id.* ¶ 57.

      Plaintiff alleges that Mr. Johnson responded to Councilman Catania's investigation by

launching an ultimately unsuccessful attempt to have Plaintiff terminated for failing to comply

with a District residency preference requirement. *Id.* ¶¶ 59-69.  Although Plaintiff was issued a

Notice to Show Cause why she should not be fired for violating the residency requirement, it was

ultimately dismissed in August 2006 because DOH failed to prove that Plaintiff's position was

subject to a residency requirement and/or failed to prove that Plaintiff was advised that she was

required to remain a District resident after she was hired. *Id.* ¶¶ 62, 66, 68-69.  Plaintiff further

alleges that while the residency investigation was pending, Mr. Anthony told another DOH employee and union steward that he was going to terminate Plaintiff, that Plaintiff was not on good terms with Mr. Johnson because of her testimony before the D.C. Council, and that Mr. Johnson said Plaintiff "talked too much" and revealed things to Councilman Catania that Mr. Johnson did not want disclosed. *Id.* ¶ 67.

According to Plaintiff, after Mr. Johnson learned that she was not going to be removed based on the residency requirement, he offered to find her a job outside of APRA and became hostile when she declined his offer. *Id.* ¶ 70. Plaintiff alleges that Mr. Johnson continued to harass Plaintiff through the fall of 2006 by: berating her, *id.* ¶ 71; making unnecessary work-related demands, *id.* ¶¶ 73-74; removing Plaintiff's responsibility for the ACIS contract without informing her and shrinking her staff as a result, *id.* ¶¶ 75-76; relocating Plaintiff's office space to a less desirable space and splitting her staff into different office spaces, *id.* ¶¶ 77-81, 84-86; removing Plaintiff's assigned parking space, *id.* ¶ 85; and denying Plaintiff the use of a Blackberry, *id.* ¶ 87. Plaintiff alleges that during the same period, Mr. Johnson repeatedly threatened to fire her, including for not being a "team player," *id.* ¶¶ 72, 95; began preparing a termination letter for Plaintiff, *id.* ¶ 88; sought permission to lower Plaintiff's performance evaluation, *id.* ¶ 89; directed a subordinate to audit Plaintiff's time and attendance records, *id.* ¶ 92; and interfered with a workers' compensation claim that Plaintiff filed, *id.* ¶ 93. According to Plaintiff, she filed a statutory notice of action with the Office of Risk Management in August 2006, after which Mr. Johnson "objected to [Plaintiff's] efforts to exercise her statutory rights" and told her "that he did not take to threats very well." *Id.* ¶¶ 82-83.

Plaintiff's remaining allegations do not specifically relate to Defendant Johnson. Plaintiff

claims that APRA has refused to give her a performance evaluation for 2006, with the result that she has not received the merit pay increase she deserves, that "Defendants" demoted her by changing her title and position, and that APRA has not responded to her request that the duties that Mr. Johnson removed from her be restored. *Id.* ¶¶ 98-99. Finally, Plaintiff asserts that on March 15, 2007, Linda Fisher, Interim Deputy Director of APRA, advised Plaintiff that her position was being abolished effective April 1, 2007, and that she would have to reapply for her position despite the fact that it would remain in existence under a different job title. *Id.* ¶ 100.

> D. *Procedural History*

Plaintiff filed her initial complaint in this action on December 4, 2006, and Defendants moved to dismiss that complaint on February 2, 2007. The Court denied Defendants' initial motion to dismiss without prejudice after Plaintiff filed her First Amended Complaint on March 20, 2007. Plaintiff's First Amended Complaint contains two claims. Count I is brought pursuant to 42 U.S.C. § 1983 and alleges that Defendants retaliated against Plaintiff for activity protected under the First Amendment to the United States Constitution, namely her testimony before the D.C. Council and her remarks during her private meeting with Councilman Catania. Am. Compl. ¶¶ 101-07. Count II is brought pursuant to the District of Columbia Whistleblower Protection Act, and alleges that Defendants took or threatened to take "prohibited personnel actions" against Plaintiff for the "protected disclosures" she made during her testimony before the D.C. Council and her meeting with Councilman Catania. *Id.* ¶¶ 108-113.

Defendants moved to dismiss Plaintiff's First Amended Complaint on April 6, 2007, Plaintiff filed her Opposition on May 21, 2007, and Defendants filed their Reply on June 7, 2007. Finally, on June 13, 2007, Plaintiff filed a notice of supplemental authority.

## II: LEGAL STANDARD

The Federal Rules of Civil Procedure require only that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007) (per curiam). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id*. at 1964-65; *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986). Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp*., 127 S. Ct. at 1965 (citations omitted).[3]

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994); *see also Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be 'liberally

---

[3] Both parties erroneously suggest that this Court should only dismiss Plaintiff's complaint if it is clear that Plaintiff can prove no set of facts that would entitle her to relief. *See* Pl's Opp'n at 6, Def.'s Mem. at 5. The Supreme Court rejected this "no set of facts" standard, which derives from *Conley*, in *Bell Atlantic*, stating that it was "best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.*, 127 S. Ct. at 1969. According to the Supreme Court, *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.*

construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged."). While the court must construe the Complaint in the Plaintiff's favor, it "need not accept inferences drawn by the plaintiff[] if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Moreover, the court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997). The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993). Factual allegations in briefs of memoranda of law may not be considered when deciding a Rule 12(b)(6) motion, particularly when the facts they contain contradict those alleged in the complaint. *Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994); *cf. Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint control).

## III: DISCUSSION

Before turning to the bulk of Defendants' arguments for dismissal of Plaintiff's claims, the Court briefly addresses Defendants' assertion that Plaintiff cannot sue Defendants Johnson and Anthony in their individual capacities under the D.C. WPA. In her Opposition, Plaintiff denies that the First Amended Complaint includes such a claim, but the First Amended Complaint itself is far from clear on this point. *See* Pl.'s Opp'n at 14 n.7. It appears that Plaintiff did not intend to bring a WPA claim against Defendants Johnson and Anthony individually and,

10

in any event, she concedes that one would lack merit in light of Judge John D. Bates' conclusion

in *Winder v. Erste*, No. Civ. A. 03-2623, 2005 WL 736639 (D.D.C. Mar. 31, 2005), that the

WPA does not create a private right of action against individual supervisors.  *See also Tabb v.*

*District of Columbia*, 477 F. Supp. 2d 185, 189 (D.D.C. 2007) (finding *Winder v. Erste*

persuasive and agreeing with it).  Therefore, the Court shall dismiss any potential WPA claim

against Defendants Johnson and Anthony in their individual capacities.  The Court therefore

turns to the remainder of Defendants' arguments for dismissal of Plaintiff's First Amendment

claim and WPA claim.

A.    *Count I: Plaintiff's First Amendment Claim*

Plaintiff brings Count I of her First Amended Complaint under 42 U.S.C. § 1983, alleging

that Defendants retaliated against her for activity protected by the First Amendment, namely her

testimony before the D.C. Council and her remarks during her private meeting with Councilman

Catania.  Am. Compl. ¶¶ 101-07.  The Court addresses each of Defendants' three arguments in

response to this claim, albeit not in the order presented by Defendants.

1.  *Plaintiff Sufficiently Pleads Acts of Retaliation*

Defendants argue that Plaintiff cannot state a claim for retaliation in violation of the First

Amendment because she does not allege that she was suspended, demoted or terminated by

Defendants Johnson and Anthony, and thus "has failed to plead an adverse action causally related

to the alleged exercise of her First Amendment rights."  Defs' Mem. at 9-11.  This argument is

unavailing for two significant reasons.  First, Defendants' argument is based upon outdated case

law regarding a plaintiff's burden in stating a *prima facie* case of retaliation under Title VII of the

Civil Rights Act of 1964.  *See id.* (citing, *inter alia*, *Brown v. Brody*, 199 F.3d 446 (D.C. Cir.

1999)).  As Plaintiff correctly notes in her Opposition, the Supreme Court recently clarified in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), that, because Title VII's retaliation and discrimination provisions are not "coterminous," *id.* at 2414, the anti-retaliation provision of Title VII is "not limited to discriminatory actions that affect the terms and conditions of employment," *id.* at 2412-13.

Far more significantly, however, Defendants' argument fails to recognize that "even minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures." *Velikonja v. Mueller*, 315 F. Supp. 2d 66, 76 (D.D.C. 2004) (quoting *Smith v. Fruin*, 28 F.3d 646, 649 n.3 (7th Cir. 1994)).  Indeed, the D.C. Circuit has concluded that "[e]mployer action taken against an employee in response to her exercise of free speech need not be as significant as the denial of a promotion to raise a constitutional claim." *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994).  Further, "the Supreme Court has noted [that] the First Amendment protects government employees from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights.'" *Id.* (quoting *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76 n.8 (1990) (ellipsis in original; quotation omitted)).  Here, Plaintiff alleges that Defendants retaliated against her in a variety of ways after her testimony before the D.C. Council and meeting with Councilman Catania, including the following: by reprimanding her, by repeatedly threatening to fire her, by removing her responsibilities and staff, by moving her office to a less desirable location, and by attempting to have her terminated for violating the residency requirement.  Plaintiff thus sufficiently alleges that she suffered an adverse act of retaliation, as defined in the relevant case law.

Defendants also argue that Plaintiff has "failed to show that her testimony or private meeting with Catania was a 'motivating factor' in the alleged retaliatory acts." Def.'s Mem. at 10-11. As discussed below, Plaintiff will ultimately be required to prove as much to prevail on her First Amendment claim. At this point, however, it is sufficient for Plaintiff to allege, as she does, that Mr. Johnson was displeased and critical of her testimony before the D.C. Circuit, became aware of her private meeting with Councilman Catania, and took adverse actions against her in retaliation. *See* Am. Compl. ¶¶ 47, 57, 67, 96, 105.

 2. *Plaintiff Cannot Pursue a First Amendment Claim Based on Her Testimony Before the D.C. Council*

As the D.C. Circuit recently stated, "[t]he speech of public employees enjoys considerable, but not unlimited, First Amendment protection." *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007) (citing *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998)). "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Waters v. Churchill*, 511 U.S. 661 (1994)). Nevertheless, "public employees do not surrender all their First Amendment rights by reason of their employment." *Id.* at 417. Accordingly, a public employee who claims retaliation in violation of her First Amendment rights must meet a four-factor test:

 First, the public employee must have spoken as a citizen on a matter of public concern. [*Garcetti*, 547 U.S. at 418; *Tao*, 27 F.3d at 638-39]. "Second, the court must consider whether the governmental interest in 'promoting the efficiency of the public services it performs through its employees' . . . outweighs the employee's interest, 'as a citizen, in commenting upon matters of public concern' . . . ." *O'Donnell*, 148 F.3d at 1133 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 [] (1968). Third, the employee must show that her speech was "a substantial or motivating factor in prompting the retaliatory or punitive act." *Id.*

13

> Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech. *See id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 [] (1977)).

*Wilburn*, 480 F.3d at 1149. "The first two factors . . . are questions of law for the court to resolve, while the latter are questions of fact ordinarily for the jury." *Tao*, 27 F.3d at 639 (citing *Hall*, 856 F.2d at 258).

Defendants argue that Plaintiff cannot establish the first of these four factors, i.e., that she "spoke as a citizen on a matter of public concern." In *Garcetti*, the Supreme Court clarified that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. This is so because "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421-22. Moreover, "[e]mployers have heightened interests in controlling speech made by an employee in his or her professional capacity . . . [and] [s]upervisors must ensure that their employee's official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Id.* at 422-23.

Applying these principles, the Supreme Court in *Garcetti* concluded that a state deputy district attorney, Richard Ceballos, was not entitled to First Amendment protection for a memorandum he wrote notifying his supervisors of inaccuracies in an affidavit used to procure a search warrant. *Id.* at 413-14. The Supreme Court's conclusion was based on the undisputed

fact that the memorandum was written pursuant to Ceballos' duties as a calendar deputy, which included investigating aspects of pending cases. *Id.* at 414, 421. The Supreme Court distinguished Ceballos' case from that of the teacher in *Pickering* who wrote a letter to a local newspaper addressing issues including the funding policies of his school board, noting the latter was "the kind of activity engaged in by citizens who do not work for the government." *Id.* at 423; *see also Pickering*, 391 U.S. 563. Similarly, in *Wilburn*, the D.C. Circuit concluded–based on *Garcetti*–that the former interim director of the District of Columbia Office of Human Rights did not enjoy First Amendment protection for alleging that the District's Office of Personnel engaged in discrimination based on race and gender when it refused to approve two salary requests. 480 F.3d at 1150-51. The D.C. Circuit found it persuasive that the plaintiff "described her responsibilities to include salary and hiring matters . . . and suggested that exposure of discriminatory government practices lay within her duties" and her official job description. *Id.* The D.C. Circuit therefore concluded that the plaintiff "did not speak as a citizen" in alleging discrimination by the District Office of Personnel. *Id.*

This precedent leads to two different conclusions in the instant action. Insofar as Plaintiff's First Amendment claim is based on her testimony before the D.C. Council, Plaintiff's own allegations reveal that that testimony was made pursuant to her official duties. Specifically, Plaintiff alleges that her "job description require[d] her to provide her findings to senior executive personnel in the District government . . . ." Am. Compl. ¶ 15. Further, Plaintiff explicitly alleges that as "chief" of CREG, she provided written answers to the D.C. Council about ACIS. *Id.* ¶ 34. Moreover, Plaintiff alleges that she was "expected to attend the oversight hearing so if Mr. Johnson was not sure how to a respond to a question put to him, the manager

directly responsible would be available to assist" and admits that she "was told there was a small chance that [she] could be called to testify at the oversight hearing." *Id.* ¶ 36.

Plaintiff argues that her testimony is nevertheless protected speech because testifying before the D.C. Council "was not part of her regular, routine duties." Pl.'s Opp'n at 11-12. This argument is unavailing, however, because an employee's speech may be pursuant to his or her official duties–and thus unprotected by the First Amendment–even where the particular duty at issue "constitute[s] an unusual aspect of the plaintiff's employment." *Wilburn*, 480 F.3d at 1150 (citing *Battle v. Board of Regents for Ga.*, 468 F.3d 755 (11th Cir. 2006)). Equally unavailing is Plaintiff's allegation that her "job description [did] **not** include a requirement that she would report to the District Council or testify before the Council." Am. Compl. ¶ 15. Even if true, this distinction is irrelevant because *Garcetti* specifically noted that in determining whether a public employee acted pursuant to her official duties, the "proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient" to demonstrate that an employee acted within the scope of his or her professional duties. 547 U.S. at 424-35. In sum, the Court concludes that Plaintiff's own allegations establish that when she testified before the D.C. Council, she did so pursuant to her official duties as Chief of CREG, rather than as a citizen. As a result, Plaintiff cannot maintain a First Amendment claim based on that testimony.

In contrast, Plaintiff's First Amended Complaint sufficiently alleges facts and raises inferences that might establish that she spoke as a citizen on a matter of public concern when she met privately with Councilman Catania. Plaintiff does not specifically allege whether the

16

meeting occurred during business hours or who requested the meeting, but does allege that she

"and her husband met privately for an hour with Mr. Catania and two of his aides." Am. Compl.

¶ 54. Furthermore, Plaintiff's allegation that "[o]n information and belief, [Mr.] Johnson became

aware that [Plaintiff] met with Councilman Catania," at some point after the meeting occurred,

*id.* ¶ 57, raises a reasonable inference that Plaintiff's supervisors were not aware of, and therefore

did not authorize, the meeting. Defendants argue that Plaintiff cannot pursue a First Amendment

claim based on her meeting with Councilman Catania because it concerned her "role as chief of

staff and her official duties with the agency at which she was employed." Defs' Mem. at 8.

However, as the Supreme Court has warned, official job descriptions are "neither necessary nor

sufficient to demonstrate that conducting [a] task is within the scope of [an] employee's

professional duties for First Amendment purposes," *Garcetti*, 547 U.S. at 424-35.

Plaintiff must meet a low standard to survive Defendants' motion to dismiss. *See Bell

Atl. Corp.*, 127 S. Ct. at 1965 ("a well-pleaded complaint may proceed even if it strikes a savvy

judge that actual proof of those facts is impossible, and 'that a recovery is very remote and

unlikely.'") (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Ultimately, Plaintiff will be

required to demonstrate, as a matter of law, that she spoke as a citizen when she met privately

with Councilman Catania. For the time being, however, it is sufficient that Plaintiff's First

Amended Complaint contains factual allegations and raises reasonable inferences that might

demonstrate that in meeting with Councilman Catania she acted as a citizen, rather than pursuant

to her official duties as a public employee.

Defendants also challenge the sufficiency of Plaintiff's allegations that she spoke on a

matter of public concern when she met privately with Councilman Catania, noting that Plaintiff

only reported harassment by Mr. Johnson following her testimony before the D.C. Council, and "stat[ed] that she did not have a copy of the [Softscape] contract . . . and had doubts about whether the contract actually existed." Defs' Mem. at 8; Am. Compl. ¶¶ 54-55. According to Defendants, Plaintiff's report of harassment amounted to an internal workplace grievance, rather than an issue of public concern. Defs' Mem. at 8. To be sure, "an individual personnel dispute does not generally constitute a matter of public concern." *Tao*, 27 F.3d at 639-40 (citing *Connick v. Myers*, 461 U.S. 138, 148 (1983); *Hall*, 856 F.2d at 259-60). Nevertheless, "an employee's speech aimed at resolving a personnel dispute may touch upon an issue of public concern." *Id.* (citations omitted).

Moreover, Plaintiff's First Amended Complaint alleges that, in addition to reporting harassment following her D.C. Council testimony, Plaintiff revealed to Councilman Catania that she did not have a copy of the Softscape contract and had doubts as to whether it actually existed. Am. Compl. ¶¶ 55. Plaintiff argues that this speech involved a matter of public concern because it related to "the failure of a contractor to provide [a necessary] computer program . . . where the contractor has received large sums of public money, and may not even have a properly executed written contract with the District." Pl.'s Opp'n at 13-14. The Court agrees with Plaintiff that her allegations, while not as explicit as they might be, are sufficient to suggest speech involving a matter of public concern. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Furthermore, "[t]he reporting of waste, fraud, and abuse are matters of public concern." *Sanders v. District of Columbia*, 522 F. Supp. 2d 83, 89 (D.D.C. 2007) (citing *Bridges v. Kelly*, 977 F. Supp. 503, 509 (D.D.C. 1997)). In the proper

factual context–which cannot be evaluated based solely on Plaintiff's complaint–Plaintiff's statements to Councilman Catania might suggest waste, fraud, or abuse. As such, the Court shall deny Defendants' motion to dismiss insofar as it relates to the remarks Plaintiff made during her private meeting with Councilman Catania.[4]

> 3.   *Plaintiff Sufficiently Alleges a Claim Against the District of Columbia Pursuant to 42 U.S.C. § 1983*

Having concluded that Plaintiff alleges facts sufficient to sustain a First Amendment claim based on her meeting with Councilman Catania, the Court turns to Defendants' argument that Plaintiff cannot pursue such a claim against the District of Columbia because "she has failed to plead sufficient facts to support municipal liability against the District." Defs' Mem. at 8.[5] Pursuant to 42 U.S.C. § 1983, "[A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject or cause to be subjected, any person to the

---

[4] Plaintiff's First Amended Complaint contains other allegations of improprieties in connection with the Softscape contract. *See* Am. Compl. ¶¶ 31-32 (alleging that the Softscape contract was a single source contract and that it was signed before APRA received official approval from the District's technology office). These allegations appear aimed at calling into question the validity of the contract, but also appear irrelevant because Plaintiff does not allege that she testified as to these issues or reported them to Councilman Catania during their private meeting. In the absence of such an allegation, Plaintiff cannot show that she was retaliated against in violation of her First Amendment rights in connection with these issues.

[5] Although Defendants do not state as much, the logical result of Defendants' argument that Plaintiff does not sufficiently allege municipal liability against the District would be that Plaintiff likewise could pursue her First Amendment claim against Defendants Johnson and Anthony in their official capacities. When government officials are sued in their official capacities, they are not personally liable for damages. *Atchinson v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996). Rather, "a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain." *Dugan v. Rank*, 372 U.S. 609, 621, 83 S. Ct. 999, 10 L. Ed. 2d (1963). Nevertheless, because the Court concludes below that Plaintiff sufficiently alleges municipal liability on the part of the District, she may also, for the time being, pursue her First Amendment claim against Defendants Johnson and Anthony in their official capacities. Plaintiff's claim against Defendants Johnson and Anthony in their individual capacities also remains.

deprivation of any rights, privileges or immunities secured by the Constitution of the United

states, shall . . . be liable to the party injured . . . ."[6]   In *Monell v. Department of Social Services*,

436 U.S. 658 (1978), the Supreme Court concluded that this language evidenced a congressional

intent to permit municipal liability under specific circumstances.  *Id.* at 690-91; *see also*

*Pembaur v. Cincinnati*, 475 U.S. 469, 477-78 (1986).  However, "a municipality cannot be held

liable *solely* because it employs a tortfeasor–or, in other words, a municipality cannot be held

liable under § 1983 on a *respondeat superior* theory."  *Monell*, 436 U.S. at 691.  As such, "a

local government may not be sued under § 1983 for an injury inflicted solely by its employees or

agents.  Instead, it is when execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts

the injury that the government entity is responsible under § 1983."  *Id.* at 694.

      The status of "policymaker," for Section 1983 purposes, can be achieved either through

express legislation or through a less formal delegation of authority.  *See Pembaur*, 475 U.S. at

483.  Nevertheless, actors are not final policymakers merely because they have the authority to

exercise discretion.  *See id.* at 482-83 ("The fact that a particular official–even a policymaking

official–has discretion in the exercise of particular functions does not, without more, give rise to

municipal liability based on the exercise of that discretion.  The official must also be responsible

for establishing final government policy respecting such activity before the municipality can be

held liable.") (internal citations omitted).  *See also Triplett v. District of Columbia*, 108 F.3d

1450, 1454 (D.C. Cir. 1997) (noting that a final policymaker must be capable of more than "mere

---

[6] The District of Columbia is treated as a municipality for purposes of 42 U.S.C. § 1983. *Bridges*, 977 F. Supp. at 506 n.4 (citing *Dorman v. District of Columbia*, 888 F.2d 159, 162 (D.C. Cir. 1989)).

exercise of discretion") (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988)).  Rather, the official must possess policymaking authority specific to the conduct at issue.  *See Pembaur*, 475 U.S. at 483 ("We hold that municipal liability under § 1983 attaches where–and only where–a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.") (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).

Defendant argues that "Plaintiff's complaint lacks allegations that her injuries were the result of any District custom, policy or practice and/or that a final policymaker was responsible for her alleged injuries."  Defs' Mem. at 9.  To the contrary, Plaintiff specifically alleges that Mr. Johnson was the Senior Deputy Director of APRA, that Mr. Anthony was Mr. Johnson's chief of staff, and that both Mr. Johnson and Mr. Anthony were final policymakers for the District because they were delegated such authority.  Am. Compl. ¶¶ 7-8.  While these allegations are not robust, they are nevertheless sufficient at the pleading stage.  Indeed, in *Amons v. District of Columbia*, 231 F. Supp. 2d 109 (D.D.C. 2002), Judge Reggie B. Walton concluded that a complaint sufficiently stated a claim for municipal liability even though the plaintiff failed to name a policy-making official in his complaint, "because the complaint 'need not allege all that a plaintiff must eventually prove.'" *Id.* at 115-16 (quoting *Atchinson v. District of Columbia*, 73 F.3d 418, 422 (D.C. Cir. 1996)).

Furthermore, an individual's actions may give rise to municipal liability where the individual has "final policymaking authority [under] state law." *Triplett*, 108 F.3d at1453 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).  Applying that criteria, the court in *Banks v. District of Columbia*, 377 F. Supp. 2d 85 (D.D.C. 2005), concluded that the

Director of the D.C. Department of Mental Health was a final policymaker under District law because she was responsible for the "'general direction and supervision'" of the administration, "promulgate[d] rules to run [her] department" and exercise[d] "vast responsibilities and expansive authority[,]" including making personnel decisions. *Id.* at 91. Here, the allegations in Plaintiff's First Amended Complaint suggest that Mr. Johnson had ultimate authority over personnel actions and work assignments within the APRA. *See* Am. Compl. ¶¶ 20, 54, 78, 87, 91, 93, 99. Plaintiff will ultimately be required to prove that, as a matter of District law, Mr. Johnson had final policymaking authority with respect to the District's alleged retaliation against Plaintiff. At this stage, however, her allegations of municipal liability are sufficient to survive Defendants' motion to dismiss.[7]

**B.    Count II: Plaintiff's D.C. Whistleblower Protection Act Claim**

Defendants also argue that Plaintiff fails to state a claim under the D.C. WPA, which states that a "supervisor shall not threaten to take or take a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure . . . ." D.C. Code § 1-615.53. The WPA defines a "prohibited personnel action" broadly as including, but not being limited to, "recommended, threatened, or actual termination, demotion, suspension, or reprimand; involuntary transfer, reassignment, or detail . . . or retaliating in any other manner against an employee because that employee makes a protected disclosure. . . ." *Id.* § 1-615.52(a)(5). "Protected disclosure" is also defined broadly, as:

---

[7] It is less clear whether Mr. Anthony, as Chief of Staff and assistant to Mr. Johnson, may be considered a "final policymaker" for Section 1983 purposes. The Court draws no conclusions in this respect at this point, but will reconsider the issue based on a full factual and legal record following discovery.

any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences: (A) Gross mismanagement; (B) Gross misuse or waste of public resources or funds; (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract; (D) A violation of a federal, state, or local law, rule or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or (E) A substantial and specific danger to the public health and safety.

*Id.* § 1-615.52(a)(6). Finally, a "public body" includes a member of the D.C. Council, such as Councilman Catania. *Id.* § 1-615.52(a)(7)(A).

Plaintiff sufficiently alleges a claim under the WPA. First, Plaintiff's allegations that Defendants reprimanded her, repeatedly threatened to fire her, removed her responsibilities and staff, moved her office to a less desirable location, and attempted to have her terminated for violating the residency requirement could constitute prohibited personnel actions under the WPA. Second, both Plaintiff's testimony before the D.C. Council and her remarks during her meeting with Councilman Catania could suffice as disclosures of information to a public body. Finally, Plaintiff's allegations are sufficient to suggest that she reasonably believed her testimony and remarks to Councilman Catania evidenced gross mismanagement, misuse or waste of public funds, abuse of authority in connection with a public contract, or a violation of a term of a District contract not of a merely technical or minimal nature. The "proper test" to determine whether an employee's belief is "reasonable" under the WPA is: "[c]ould a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence [one of the delineated issues]." *Zirkle v. District of Columbia*, 830 A.2d 1250, 1259-50 (D.C. 2003) (quoting *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)).

Applying that test, the Court concludes Plaintiff's allegations are sufficient to survive Defendants' motion to dismiss. Defendants attempt to downplay the significance of Plaintiff's disclosures by noting her allegation that her testimony lasted only 10 minutes and was limited to three main topics. Defs' Mem. at 11. However, Plaintiff also specifically alleges that by testifying that ACIS was only capable of collecting demographic information as of February 2006 and would not be up and running until November 2006, she revealed that the software was a major failure, waste of public funds, and did not meet the primary goals of the contract. Am. Compl. ¶¶ 41-42. Likewise, as noted above, Plaintiff alleges that during her private meeting with Councilman Catania, she told him that she did not have a copy of the Softscape contract and had doubts about whether it actually existed. *Id.* ¶ 55. These allegations are sufficient to suggest that Plaintiff reasonably believed her speech evidenced gross mismanagement, misuse or waste of public funds, abuse of authority in connection with a public contract, or a violation of a term of a District contract not of a merely technical or minimal nature. As such, the Court shall deny Defendants' motion to dismiss with respect to Plaintiff's WPA claim.

## IV: CONCLUSION

For the foregoing reasons, the Court shall GRANT-IN-PART and DENY-IN-PART Defendants' Motion to Dismiss. Specifically, the Court concludes that Plaintiff cannot state a First Amendment claim based upon her testimony before the D.C. Council, and shall therefore dismiss Count I of Plaintiff's First Amended Complaint insofar as it relies upon that testimony. The Court shall also dismiss any potential WPA claim against Defendants Johnson and Anthony

in their individual capacities.  The Court shall deny the remainder of Defendants' Motion to

Dismiss.

Date:   March 14, 2008

                                        ___/s/_____

                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge